FILED
JUL 03 2013
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NUMBER: 13-mj-3049-DGW |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| MICKEY GIBB, ) | **FILED UNDER SEAL** |
| a/k/a "JR" ) | |
| ANTWYNE WARREN, ) | |
| a/k/a "Pac Man," ) | |
| CHRISTOPHER JENKINS, ) | |
| a/k/a "Yellow," ) | |
| ) | |
| Defendants. ) | |

## CRIMINAL COMPLAINT

I, Russell Johnson, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

**COUNT 1**
**CONSPIRACY TO POSSESS WITH**
**INTENT TO DISTRIBUTE COCAINE**

From on or about June 27, 2013, the exact dates being unknown, in St. Clair County, within the Southern District of Illinois, and elsewhere,

MICKEY GIBB,
a/k/a JR,
ANTWYNE WARREN,
a/k/a "Pac Man," and
CHRISTOPHER JENKINS,
a/k/a "Yellow,"

defendants herein, did conspire and agree with each other and with others known and unknown, to knowingly and intentionally possess with intent to distribute, a mixture or substance containing a detectable amount of cocaine, a Controlled Substance, in violation of Title 21,

United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii). All in violation of Title 21, United States Code, Section 846.

The total amount of cocaine involved in the conspiracy which was reasonably foreseeable to the defendants was five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine.

## COUNT 2
## BRANDISHING FIREARMS IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE

On or about July 2, 2013, in St. Clair County, Illinois, within the Southern District of Illinois,

MICKEY GIBB,
a/k/a JR,
ANTWYNE WARREN,
a/k/a "Pac Man," and
CHRISTOPHER JENKINS,
a/k/a "Yellow,"

defendants herein, while aiding and abetting each other, did knowingly use and carry a firearm during and in relation to, and did brandish said firearm during the course of, a drug trafficking offense for which he may be prosecuted in a Court of the United States, to wit: "Conspiracy to Possess with Intent to Distribute Cocaine" in violation of Title 26, United States Code, Section 846 as set forth immediately above. All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and that this complaint is based on the following facts:

## AFFIDAVIT

## INTRODUCTION

1. After being duly sworn, I hereby state that I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed since November

2005. During this time, I have investigated, among other things, violations of the federal firearms and narcotics laws, as well as crimes of violence and gang-related crimes. I have received training in, among other things, criminal procedure, search and seizure, firearms and narcotics investigations, and the identification and investigation of organized gangs. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I respectfully submit this Affidavit in support of a Criminal Complaint charging Mickey GIBB, a/k/a JR, Antwyne WARREN, a/k/a Pac Man, and Christopher JENKINS, a/k/a Yellow, for violations of Title 21, United States Code, Section 846: conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine and Title 18, United States Code, Section 924(c)(1)(a): using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a drug trafficking crime.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for the arrests of GIBB, WARREN, and JENKINS, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrests of GIBB, WARREN, and JENKINS.

4. Moreover, the statements contained in this Affidavit are based on the investigation of your affiant, as well as information derived from reports and interviews of the law enforcement officers and witnesses named herein. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part only. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.

### BACKGROUND OF THE INVESTIGATION

5. On June 27, 2013, ATF Special Agent (SA) Russell Johnson debriefed an ATF confidential informant (CI)[1] regarding the CI's interaction with Mickey GIBB. GIBB bragged to the CI about being a shooter and told the CI to "google" him. GIBB told the CI he had committed

---

1 The CI has been providing information to the ATF for approximately one year. The information provided to ATF, to date, has been found to be credible and much of it has been corroborated. The CI's motivation for providing information is based solely on receiving financial consideration.

previous robberies and bragged to the CI about his criminal record. The CI informed GIBB he had an associate who was looking for a crew of individuals to conduct a narcotics robbery of his source of narcotics. The CI made arrangements for GIBB to meet his associate later on this same date.

6. On June 27, 2013, SA Townsend met with GIBB in Sauget, Illinois, for the purpose of discussing a home invasion style robbery. SA Townsend explained to GIBB that he transported "kilos" of cocaine for a Cartel organization and wanted out of the business because he was not being paid as much as promised. SA Townsend explained to GIBB that he transports one (1) to three (3) kilograms of cocaine. SA Townsend stated that because he is trusted by the Cartel, he is usually one of the first individuals to pick-up cocaine from the stash house and he has seen at least fifteen (15) kilos inside the houses.

7. GIBB asked SA Townsend if the individuals he (SA Townsend) was working for were "Mexicans," which SA Townsend answered yes and stated there was always two of them inside the house. SA Townsend told GIBB that one of the Mexicans was always armed with a pistol in his waistband. SA Townsend explained to GIBB the importance of timeliness and that once he received the call from the Mexicans, he would only have thirty (30) minutes to get to the stash house or they would move the cocaine. GIBB asked SA Townsend "so you want to be done fucking with them . . . no matter what it takes?" to which SA Townsend answered yes. SA Townsend told GIBB that he (SA Towsend) had to look like a victim in the robbery because the Cartel knows some of his people.

8. SA Townsend advised GIBB that the Mexicans would not just hand over the cocaine, to which GIBB replied "I been to the joint, I know how these things get down. I already know." SA Townsend informed GIBB that if he was going to conduct the robbery, he needed individuals who had experience committing such robberies, to which GIBB replied "exactly." SA Townsend further stated he needed professionals and GIBB agreed by stating "right…I get down." GIBB asked SA Townsend how many days he would have to assemble the crew, to which SA Townsend stated he would have more information regarding the date after talking to his connection.

9. GIBB told SA Townsend "I'm looking for the money; I don't care to see where it's at." SA Townsend told GIBB that there was not any money inside the residence, just "pure cocaine" from the cartel. GIBB replied "to me you see, that's still money." SA Townsend informed

GIBB that the packages of cocaine had stamps on them identifying which Cartel they were affiliated with and asked GIBB if he knew what to do with them. GIBB replied "I just break it down." SA Townsend asked GIBB what his thoughts were regarding splitting the cocaine acquired from the robbery down the middle and GIBB stated "down the middle. Exactly." GIBB informed SA Townsend that he was going to get his crew lined up on this same evening.

10. SA Johnson met with the CI on June 27, 2013, immediately following the CI dropping GIBB off at his residence. The CI stated GIBB directed him to a residence in East St. Louis, Illinois, for the purpose of meeting additional members of the robbery crew. Once inside the residence, the CI stated he was greeted by three (3) unknown individuals. GIBB informed the three (3) individuals about the robbery, including but not limited to there was a stash house which contained fifteen (15) or more kilos and there were two (2) armed Mexicans inside the house. GIBB told the three (3) individuals that the CI and his associate (SA Townsend) had to look like victims. While inside the residence, the CI observed six (6) firearms, including two (2) rifles and four (4) handguns. The CI stated the individuals bragged about pistol whipping an individual and other robberies they had committed.

11. On June 28, 2013, SA Townsend met with GIBB and an unknown individual, who introduced himself to SA Townsend as JERO, to discuss a home invasion robbery. SA Townsend explained to GIBB and JERO that he transports cocaine for a Mexican Cartel organization and that he regularly picks up one (1) to three (3) kilos of cocaine from the stash house every seven (7) to ten (10) days. SA Townsend explained that the cocaine contained stamps, indicating they were coming directly from the Cartels in Mexico. SA Townsend explained that he has not been paid fairly for the work he has done for the Cartel and wanted somebody to steal the cocaine for him. SA Townsend stated he would split the cocaine with the individuals.

12. SA Townsend further explained that there are always two guards inside the house and one of them is always armed with a handgun in their waistband. SA Townsend informed GIBB and JERO that he was unaware of the second guard having a firearm, to which JERO stated "he got one, he got one." SA Townsend told GIBB and JERO that the guards would not just let GIBB and JERO have the cocaine, to which GIBB stated they were not going to leave anyone in the residence. GIBB asked SA Townsend "have you ever seen more than two," to which SA Townsend answered no.

13. SA Townsend asked GIBB and JERO if they knew what they were doing in terms of committing the robbery. GIBB replied that they would go inside the house and do what they needed to do. JERO further added "you can believe this, you say they only two dudes, we ain't losing this shit." SA Townsend informed GIBB and JERO that he would receive more information on this same evening and would like to meet with GIBB and JERO the following day, to which both agreed. GIBB further added that he would bring two additional individuals who would be participating in the robbery. SA Townsend reiterated the fact the robbery involved "cartels" and "cocaine" and GIBB answered by stating "I know." SA Townsend reiterated that there was at least fifteen (15) kilos of cocaine and he routinely picks up one (1) to (3). JERO patted his chest with his fist in acknowledgement of SA Townsend's statement.

14. On June 29, 2013, SA Townsend met with GIBB and YELLOW, later identified as Christopher JENKINS, to discuss the proposed home invasion robbery in Sauget, Illinois. SA Townsend informed GIBB and JENKINS that the pick-up date for his cocaine would be July 2, 2013. SA Townsend explained to JENKINS that he is a cocaine trafficker for a Mexican Cartel organization and he has become disgruntled and wants out of the business. SA Townsend stated to JENKINS, "I'm guessing you are here to help out." Jenkins nodded his head up and down. SA Townsend informed JENKINS that that he was looking for professionals to conduct a robbery of the cocaine stash house. SA Townsend further explained that there were always two guards inside the residence and at least one (1) of them was armed with a firearm. SA Townsend further explained that he regularly picks up one (1) to three (3) kilos and that there are at least an additional fifteen (15) inside the house.

15. SA Townsend asked JENKINS if he had ever conducted such a robbery before and if he was comfortable with being part of this, to which JENKINS acknowledged in an affirmative manner. SA Townsend expressed concern about his safety during the robbery, to which JENKINS replied "no problem." SA Townsend inquired as to whether or not GIBB and JENKINS had firearms. GIBB informed SA Townsend that they currently had two (2) firearms and were going to acquire another one. GIBB told SA Townsend that there would be three individuals committing the robbery. GIBB stated that once they get inside the residence, they were going to lay everyone down.

16. SA Townsend reiterated that once he received the call for him to come pick-up his

cocaine, he would only have thirty (30) minutes to arrive at the stash house. SA Townsend further explained the importance of being ready when he received the phone call and not having time to wait on anything, to which GIBB replied "ain't gonna happen, ain't gonna be waiting." GIBB again reiterated they are "laying everybody down." SA Townsend clarified to GIBB and JENKINS that the CI would not be participating in the robbery and would wait for SA Townsend, GIBB, and the rest of the crew at SA Townsend's warehouse, to which GIBB replied "we are on the same page."

17. GIBB informed SA Townsend that he and his crew were ready to do the robbery and they were "just waiting on Tuesday." SA Townsend asked GIBB and JENKINS if they were on board with the proposed robbery, to which JENKINS replied "I'm good" and GIBB "it ain't no problem." SA Townsend confirmed with JENKINS that he understood that the kilos of cocaine contained stamps from the Cartel. JENKINS replied "we gonna make that happen." GIBB said they were going to the house in "full force."

18. GIBB, JENKINS, and the CI left SA Townsend in the CI's vehicle, which contained an audio and video recording device. At approximately 1:21 pm, GIBB tells JENKINS, ". . . the other two were going in there with, we're wacking them . . . you know what I'm saying because we can't play. . . ." GIBB also commented "we split everything fifty-fifty." GIBB then says "this is our opportunity right here man . . . got this in the bag. . ." He then added, "if we gotta kick the door open they got the ups, you know what I'm saying? But if he unlock (referring to SA Townsend) that door, Boom! Nigger, we come in, Bam! We already up, push him to the side, knock him down, Boom! We fire their ass up. You know what I'm saying? Get our shit and come home, you know what I'm saying?" Gibb also stated, "if it's got a stamp on it. . . you know its . . . knock that logo off that motherfucker and stretch that bitch, you know what I'm saying?" And he stated, "you just get a hold bro, you hear me? You need to do that asap" JENKINS replied, "yeah."

19. Gibb further stated, "we're going in this bitch as a team bro, we ain't leaving nobody nigger, you hear . . . we all got each others back."

20. On July 2, 2013, GIBB came to the CI's residence in the morning. The CI left GIBB and met with ATF SA John Leahy, who searched the CI and the CI's vehicle for contraband with negative results. The CI returned and met up with GIBB at the CI's residence, where GIBB was

waiting. GIBB entered the CI's vehicle and the two drove to the area of Glenwood Avenue in East St. Louis. GIBB and the CI made contact with WARREN and JENKINS in the neighborhood. WARREN and JENKINS entered the CI's car, and Gibb handed WARREN and JENKINS nylon stocking caps. All four individuals then drove to 7013 Glenwood Avenue and GIBB, WARREN, and JENKINS exited the vehicle.

20. When GIBB, WARREN, and JENKINS re-enter the CI's vehicle, the CI observed both WARREN and JENKINS in possession of firearms. The CI noticed that WARREN had a revolver and JENKINS had a handgun. The CI and GIBB directed WARREN and JENKINS to put the guns in the trunk. Video of the CI's vehicle shows GIBB and JENKINS going to the trunk area of the vehicle. The CI, GIBB, WARREN, and JENKINS then traveled to SA Townsend's location in Sauget, Illinois, all riding in the CI's vehicle.

21. Once the CI, GIBB, WARREN, and JENKINS arrived, all four entered SA Townsend's undercover vehicle. SA Townsend informed GIBB, WARREN, and JENKINS they were going to a stash house which contained at least fifteen (15) kilos of cocaine that belonged to a Mexican Cartel. SA Townsend further explained there were two (2) armed guards inside the residence, one of which was armed. JENKINS confirmed with SA Townsend that there were individuals inside the stash house. WARREN acknowledged his understanding of what SA Townsend explained by stating "alright."

22. SA Townsend reiterated to the individuals that the CI would not be participating in the robbery because the guards know him, further stating that even if the CI wore a mask, he would be recognized. JENKINS then told GIBB that he agreed and stated he was not "going in with that shit...no mask on my face." JENKINS then asked SA Townsend if he (SA Townsend) wanted them to follow SA Townsend inside the residence. JENKINS then told GIBB that they should follow SA Townsend inside the residence, to which GIBB agreed. When referring to the guards, JENKINS stated he would rather "catch both of them in the same spot." JENKINS then stated "we gonna go up in, we ain't playing no games." GIBB then stated "we putting them...just laying them down." That was followed by JENKINS stating "they definitely got to go to sleep." GIBB then added "and we act like we sticking them up...get our shit, boom. Fifty-fifty we right...we splitting it fifty-fifty we get out of there."

23. SA Townsend looked directly at WARREN and asked if he agreed to the plan, to which

WARREN answered "yeah." JENKINS then added "we putting their ass…you got to put them to sleep because you say they cartel. They will come back for you, so we got to put them asleep. I ain't got no problem doing that."

24. Following the arrest of GIBB, WARREN, and JENKINS, ATF SAs searched the CI's vehicle. During the search of the vehicle, the SAs recovered a loaded, Colt, .38 caliber revolver, which contained four rounds of ammunition and a loaded Taurus, 9mm handgun, which contained nine rounds of ammunition in the trunk. The agents also found a nylon stocking cap.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Russell Johnson
Special Agent, ATF

State of Illinois     )
                      )  SS.
County of St. Clair   )

Sworn to before me, and subscribed in my presence on the 3rd day of July, 2013, at East St. Louis, Illinois.

_____
DONALD G. WILKERSON
United States Magistrate Judge

STEPHEN R. WIGGINTON
United States Attorney

_____
MONICA A. STUMP
Assistant United States Attorney