IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | No. 13-30170-DRH |
| MICKY GIBB, | ) ) ) | **HEARING REQUESTED** |
| Defendant. | ) ) | |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT**

COMES NOW Defendant Micky Gibb, ("**Gibb**") by and through his undersigned court-appointed attorney, Ronald E. Jenkins, and in support of his Motion to Dismiss Indictment, states as follows:

## I.   FACTUAL BACKGROUND

Gibb and codefendants Warren and Jenkins have been charged with the offenses of conspiracy to possess with intent to distribute cocaine, using and carrying a firearm during and in relation to a drug trafficking offense, and felon in possession of a firearm. These charges arise out of a sting operation, wherein the Bureau of Alcohol, Tobacco, and Firearms ("**ATF**") utilized an undercover agent ("**U/A**") and paid a confidential informant ("**CI**") to lure individuals from the predominately African American community of East St. Louis, Illinois, to agree to participate in a supposedly easy robbery of a non-existent stash house with the phony promise of a pay-off of at least 15 kilograms (sometimes abbreviated as "kilos") of pure cocaine.

The **ATF** supplied the **CI** with cartons of Newport cigarettes to sell at a discount in order to gain the trust of individuals in the area whom the **CI** might target in the sting. (Newport is one of the preferred cigarette brands in the African-American community.)  The **ATF** allowed the **CI**

1

to keep the proceeds of the cigarette sales to offset his expenses, but did not track or require proof or approval of these amounts. The **CI** is an African-American.

The **CI** met Gibb through an acquaintance whose sister Gibb was dating. The **CI** reported that Gibb bragged about being a "shooter," about committing various robberies, and about his criminal record. The **CI** claimed Gibb told him to "Google" him. (Nothing provided to Gibb in discovery indicates that the **CI** or any other member of the sting operation did in fact "Google" Gibb, or if they did "Google" him, what the results were.) The **CI** also stated he informed Gibb "he had an associate who was looking for a crew to commit a robbery, to which [Gibb] stated he would like to meet the **CI**'s associate." (Gibb Discovery p. 080).

While portions of the conversations between Gibb and the **CI** were recorded, certain crucial portions taking place outside of the **CI**'s vehicle, where the **CI** first explained the prospective robbery to Gibb, were not recorded. (Gibb Discovery p. 99-101).

Once the **CI** had selected Gibb to target in the sting, he arranged for him to meet with the **U/A** who posed as a disgruntled drug dealer who had knowledge of a stash house that could be robbed easily. Gibb apparently would have slept through the meeting, but attended after multiple attempts by the **CI** to wake him. Throughout the discovery, the **U/A** repeatedly reminded Gibb of the importance of being on time or the robbery plan would fall apart. (Gibb Discovery p. 085-092).

The meetings between Gibb, the **CI**, and the **U/A** appear to have been recorded in their entirety. The **U/A** said the stash house kept up to 15 kilograms of cocaine at a time. Notes in the discovery regarding the first meeting, on June 27, 2013, state that it was arranged after the **CI** "advised **ATF** of [Mr. Gibb's] interest in committing a home invasion robbery." The **U/A** told Gibb he had been transporting "kilos" of cocaine for a Mexican cartel organization, and the **U/A**

wanted out of this business - he just "wanted to be done with them."  The **U/A** said he had been working in New Orleans, but the cartel promised him extra pay to come to St. Louis.  However, the cartel did not keep its promise, causing the **U/A** to become disgruntled.  The **U/A** told Gibb that he usually picked up one to three kilos at a time from the stash house, and that there were never less than 15 kilos at the stash house when he is called; sometimes there were 20 kilos.  He said there were always two Mexicans at the stash house, and he knew that one of them kept "a little pistol" in his waistband.  (Gibb Discovery p. 085-087).

Prompted by the **U/A**'s description of the circumstances of the proposed robbery, Gibb stated, "so you want to be done fucking with them . . . no matter what it takes?" To the **U/A**'s statement that he needed individuals with experience doing such robberies, Gibb said, "exactly."  He also said, "I been to the joint, I know how these things get down," and "I'm looking for the money; I don't care to see where it's at . . . to me you see, [pure cocaine is] still money." The **U/A** stressed to Gibb that he needed participants who would not back out, needed them to be experienced in "such robberies," that he needed professionals, and that he "assumed [Gibb] was that guy."  The **U/A** told Gibb that he [Gibb] would be responsible for finding the additional participants.  (Gibb Discovery p. 085-087).

In the recording of this conversation, the **U/A** says he will probably get a call about the cocaine that night, and that he wants to meet Gibb's crew.  In stressing how quickly they may need to act, the **U/A** said that they would need to get together again to talk about the situation. He emphasized, "We're not doing anything wrong, we're just talking."

After the initial meeting with the **U/A**, Gibb called the **CI** and asked for a ride to meet with his "robbery crew" consisting of three black males in a residence in East St. Louis. After the **CI** and Gibb arrived at the location, Gibb told the three individuals about the robbery, including

3

the fifteen kilos of cocaine, which they would split with the **U/A**, and the two armed Mexican guards. While in the residence, Gibb and the individuals showed the **CI** six firearms including a .223, AK-47, two Glock 23 pistols, a S&W 40, and a .380.  They also bragged about pistol whipping an individual and about robberies they had committed, presumably in a show of bravado for the benefit of the **CI**.  (Gibb Discovery p. 085-090).  (This information is "according to the **CI**" and was not recorded.)

The next day, the **CI** drove Gibb and an individual identified only as "Jero" to meet with the **U/A**, who repeated the details of the robbery plan.  The **U/A** asked them if they knew what they were going to do during the robbery and how they were going to do it, to which Gibb replied that they would go into the house and do what they needed to do. Gibb and "Jero" also nodded when the **U/A** told them they appeared to be the professionals the **U/A** was looking for and that he trusted them to figure out how to go about the robbery.  Because neither Gibb nor "Jero" had a vehicle with which to carry out the proposed robbery, the **U/A** offered to provide them with one with a "trap" for the cocaine.  (Gibb Discovery p. 093-096).

In a third meeting, on June 29, 3013, the **CI** picked up Gibb and an individual identified as "Yellow" (later identified as co-defendant Jenkins) to meet with the **U/A**.  The **U/A** said the robbery would occur on Tuesday, July 2nd in South St. Louis and explained the circumstances, including the minimum take of 15 kilos of cocaine.  Yellow nodded affirmatively when the **U/A** asked if he was there to "help out," and also when the **U/A** asked him if he had ever done such a robbery before and was comfortable being part of it. When the **U/A** asked if they had guns for the robbery because of the two guards, one of whom was armed, Gibb said they would "lay everyone down." However, he also said they only had two guns, and that he was having a problem getting a third gun.  The **U/A** asked Gibb what he would do after he put everyone in the stash house on

4

the ground during the robbery. Gibb said it was up to the **U/A** what he wanted to do after the robbery crew left. (Gibb Discovery p. 097- 103).

On the day of the supposed robbery, the **CI** drove to pick up Gibb, Warren, and Jenkins at different locations in East St. Louis. (Gibb Discovery p. 112). The **CI** then drove them to meet with the **U/A**. Gibb did not have a gun with him and was upset that the **U/A** did not bring one for him. (Gibb Discovery p. 129). The **CI** drove Gibb, Warren, and Jenkins to the arrest location, where all three participants were arrested. (Gibb Discovery p. 129).

## II. ARGUMENT

### A. Entrapment

"Entrapment involves 'the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would never have run afoul of the law.' The defense has two elements: government inducement of the crime and a lack of predisposition on the part of the defendant." *US v. Pillado,* 656 F.3d 754, 762-63 (7th Cir. 2011) (internal citations omitted).

#### i. Lack of Predisposition

Lack of predisposition is the principal issue in entrapment cases. *U.S. v. Estrada,* 256 F.3d 466, 475 (7th Cir. 2001). In assessing a defendant's predisposition to commit the target crime, the 7th Circuit considers the following five factors:

1. "the defendant's character or reputation;
2. whether the government initially suggested the criminal activity;
3. whether the defendant engaged in the criminal activity for profit;
4. whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and
5. the nature of the inducement or persuasion by the government."

*U.S. v. Millet,* 510 F.3d 668, 676 (7th Cir. 2007) (Citing *U.S. v. Blassingame,* 197 F.3d 271, 281 (7th Cir. 1999)). "A person who lacks predisposition…in many cases would not have committed

the crime at all but for the government's intervention. The government would have engaged in the fruitless activity of causing the very crime it wants to prosecute, and this has no societal benefit." *U.S. v. Manzella,* 791 F.2d 1263, 1269 (7th Cir. 1986).

Here, despite the Cl's report of Gibb's characterization of his own criminal history, Gibb's record does not reveal any convictions for stash-house robberies or similar crimes. It is also important to note that Gibb was in special education classes during part of his education, consistently received poor grades, and has cognitive abilities in the "borderline" range. He has had behavioral problems and mental health issues since childhood, and has been on Social Security disability for many years. (Docs 49, 73). These facts demonstrate that Gibb was a troubled individual who lacked the propensity to independently orchestrate a stash-house robbery and was susceptible to persuasion from government actors.

As discussed in more detail above, it was the **U/A** and the **CI** who invented the phony stash-house robbery scheme, who targeted and recruited Gibb as a participant, who encouraged Gibb to recruit additional participants, and who controlled every aspect of the scheme from start to finish. Furthermore, even if Gibb had wanted to carry out a stash house robbery on his own, he would have been incapable of doing so without the assistance of the **U/A** and the **CI**. Gibb did not have a vehicle and relied on the **CI** to drive him to every meeting between the **U/A**, the **CI**, and Gibb, and the **U/A** agreed to provide Gibb a vehicle to carry out the proposed robbery. Gibb also did not have a gun. As described above, he had expected the **U/A** to provide him with a gun, and, although Gibb did agree to continue with the robbery plan without one, his anger at the **U/A** demonstrates that he would probably not have originally agreed to go along with the robbery plan had the **U/A** not agreed to provide a gun.

Furthermore, there is nothing in the evidence to suggest that Gibb had knowledge of any other stash houses or other similar potential robbery targets that would yield the type of payoff he expected to recover from the phony stash house. Were it not for the actions of the **U/A** and the **CI**, Gibb would likely never have attempted a stash house robbery such as that contemplated in the sting. This is a situation where the defendant would not have committed the crime without the government's intervention. Here, the government has, in fact, engaged in the fruitless activity of causing the crime it wants to prosecute.

### ii. Excessive Government Inducement

"To show improper inducement, a defendant must put forth evidence showing that he would not have committed the crime had the particular attraction or lure that the government held out not existed." *Millet,* 510 F.3d at 677 (internal citations and quotations omitted). Extraordinary inducement is defined as "the sort of promise that would blind the ordinary person to his legal duties." *U.S. v. Haddad,* 462 F.3d 783, 790 (7th Cir. 2006), (Citing *U.S. v. Evans,* 924 F.2d 714, 718 (7th Cir. 1991). Inducement can also occur when a government agent preys on a defendant's emotional weaknesses. *U.S. v. Plowman,* 700 F.3d 1052, 1059 (7th Cir. 2012).

Judge Posner has recently criticized the excessive inducement frequently used by the government in phony stash house cases, pointing out that even an inducement that would not have been extraordinary to someone who regularly robbed stash houses might nevertheless be extraordinary to someone who (like Gibb) had never before committed a stash house robbery. *See United States v. Kindle,* 698 F.3d 401, 413 -416 (7th Cir. 2012) (Posner, J., concurring and dissenting.) The above facts demonstrate that law enforcement officials offered an excessive inducement -up to 50 kilos of cocaine and very little risk- to Gibb, who was desperately poor and

7

had no prospects. Without such excessive inducement, Gibb would not have been predisposed to commit such an offense, and never would have but for the sting.

Further and also disturbing, the **U/A** blatantly pressured Gibb to go along with the fake robbery plan, by asking him if he was a "professional," making it difficult for him to later act counter to the notion that he was, by prompting him repeatedly for assurances that he was committed to the plan, and by meeting with him repeatedly in the days leading up to the robbery, which he portrayed as imminent, forcing Gibb to act quickly to assemble a crew, with little time for reflection as to whether he really wanted to be mixed up in the plan, which was like nothing he had ever done in the past.

### B. Outrageous Government Conduct

The Fifth Amendment to the Constitution directs that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law. U.S. Const. Amend. v. In *United States v. Russell,* 411 U.S. 423 (1973), the Supreme Court stated that it "may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." *Id.* at 431-32; *United States v. Estrada,* 256 F.3d 466, 468 (7th Cir. 2001).

The Seventh Circuit so far has held that because the Supreme Court has offered "no real guidance to lower courts as to the type or level of conduct by the government that might, standing alone, amount to a due process violation . . . [it] has disallowed such a defense." *United States v. Westmoreland,* 712 F.3d 1066, 1071 -1072 (7th Cir. 2013). However, the *Westmoreland* opinion acknowledged that other circuits have recognized this defense, "Where it has been recognized, the defense has come into play only where the government's involvement created a crime or criminal

enterprise that did not exist before, and where the government had to coerce the defendant to commit the crime by some unreasonable means." *Id.* at 1072.

The Ninth Circuit has stated that the outrageous governmental conduct doctrine permits a court to dismiss an indictment when the Government engages in conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir. 1991). In assessing the outrageousness of the Government's conduct, that circuit holds that a court must consider:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*United States v. Black,* 733 F.3d 294, 302, 303 (9th Cir. 2013).

"The government 'may not provoke or create a crime, and then punish the criminal, its creature.'" *United States v. Hollingsworth,* 27 F.3d 1196, 1200 (7th Cir. 1994) quoting *Casey v. United States,* 276 U.S. 413, 423 (1928) (Brandeis, J., dissenting). "[I]nducement is significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *Id.* at 1200.

Judge Posner recently explained how fictitious stash house stings carry a serious risk of entrapment:

> Not all fictitious stash house stings justify an entrapment instruction, even though such stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences. Eda Katharine Tinto, "Undercover Policing, Overstated

> Culpability" 51-52 (NYU School of Law, Public Law Research Paper No. 12-04, August 2012; forthcoming in Cardozo Law Review, vol. 34, 2013), http:// papers. ssrn. com/ sol 3/ papers. cfm? abstract_ id= 2016362 (visited Sept. 4, 2012). And such stings create an increased risk of entrapment because of "the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects' criminal conduct." Id. at 52; *see also United States v. Briggs,* 623 F.3d 724, 729-30 (9th Cir. 2010). *415 "[T]he government can 'minimize the obstacles a defendant must overcome to obtain the drugs.' For example, the police can convince a suspect that the stash house robbery would be a shockingly simple and easy crime to commit and can provide items, such as a car, needed to complete the crime." Tinto, supra, at 52-53.

*United States v. Kindle,* 698 F.3d 401, 413 -416 (7th Cir. 2012).

The Government's method of obtaining convictions through phony stash house stings has recently become the subject of much criticism. The tactic has been the subject of two USA Today articles, one of which summed up the stings: "an **ATF** strategy meant to target armed and violent criminals has regularly used risky and expensive undercover stings to ensnare low-level crooks who jump at the bait of a criminal windfall." Brad Heath, *Entrapment? But are these faked drug stashes by the feds ' good law enforcement ' or government gone too far?* USA Today, June 28, 2013; see also Brad Heath, *Do ATF stings target minorities? Red flag raised by judge in Chicago,* USA Today, August 2, 2013.

Judge Posner called these stings a "disreputable tactic," which increase the risk of entrapment, irrationally "jacking up" the sentences of defendants who do not need to be imprisoned long-term, and have the opposite effect of decreasing the circulation of illegal drugs. *Kindle,* 698 F.3d at 415-16 (Posner, J., concurring and dissenting). He also pointed out that the effect of these stings when the target, unlike Gibb, is a real stash house robber is to make stash houses more secure by reducing their chances of being robbed. *Id.* at 416.

Further, a California District Judge recently dismissed the indictment of a defendant after deeming the phony stash house robbery sting to constitute outrageous governmental conduct. *U.S. v. Hudson,* 2:13-cr-00126-ODW-3, 2014 W.L. 960860 (C.D. Ca. Mar. 10, 2014, reconsideration denied Mar. 12, 2014). In that case, a **CI** reported to the **ATF** that Hudson had asked him if he knew any opportunities for "come-ups," which the Government interpreted to mean "robberies." *Id.* at *1. The government provided no background regarding the Cl's initial interaction with the defendant. *Id.* The **U/A** in that case then met with Hudson and another defendant and described a once in a lifetime opportunity to score 20 to 25 kilograms of cocaine from an easy nonexistent stash house robbery, where there were only two guards, only one of whom was always armed. *Id.* The **U/A** prompted Hudson to find others to participate. *Id.* at *2. They met again, and then a third time with the additional robbery participant, Dunlap, who claimed to have previously robbery experience, although nothing like the phony stash house plan. *Id.* at *3. The three met again and the **U/A** provided a rented minivan, into which Hudson placed a bag with a shotgun and revolver. *Id.* The defendants were arrested and indicted. *Id.*

In granting the defendants' motion to dismiss the indictment, the Honorable Otis D. Wright found the factors listed in *United States v. Black,* 733 F.3d 294, 302, 303 (9th Cir. 2013), warranted dismissal. *Id.* at *15. The defendants' known criminal characteristics *at the time the sting was initiated* did not show propensity for that type of conduct; the evidence did not support a suspicion that the defendants had been involved in home invasion type robberies-particularly where there was little evidence of how the informant obtained his targets for the **ATF**, the government absolutely had a role in creating the crime of conviction, the government encouraged the defendants to commit the crime by economic coercion

11

inherent in this type of fake stash house robbery, the government's participation in the offense conduct was substantial because it "called the shots" and goaded the defendants to acquire weapons, and the operation resulted in no reduced crime, but rather encourages stash house operators to be better prepared for a robbery. *See id.*

Here, Gibb's criminal history shows he had no propensity for or history of committing an offense of the caliber of a real stash house robbery, and would not have considered risking committing such offense, but for the **U/A**'s inside information that made the robbery appear low-risk, combined with the exaggerated payoff for Gibb, who is extremely impoverished. Bolstering this conclusion is the fact that Gibb expressed concern in his taped conversations with the **CI** that fifteen individuals could be guarding the stash house-to which the **CI** assured him there would be only two. Any expressions of enthusiasm Mr. Gibb made to the **U/A** were clearly in the context of the **U/A**'s prompting, and the gap in the recordings regarding what the **CI** told Mr. Gibb prior to meeting the **U/A**, and any hesitation he expressed, further weakens any probative value attributed to these statements.

Further, the Government had an undeniable role in creating the crime of conviction and in pressuring Mr. Gibb to participate. It tempted him with a large payoff without much risk - a strong temptation for someone in extreme poverty - and persuaded him with various other unfair tactics, such as repeated demands for meetings over a short period of time, repeated demands for his commitment to the operation, prompting him to say he was a professional and was willing to commit violence, making him find the other participants, and by supplying him with rides, a vehicle, and a safe house for the made-up robbery.

In addition, as described above, law enforcement officials in this case were apparently targeting African Americans in the sting, and a federal judge in the Northern District of Illinois found the defense in that case demonstrated the **ATF** had a practice of disproportionately targeting minorities in these types of stings and its facilitation of the sale of cigarettes by the **CI** was in violation of 18 U.S.C. § 2342 because it failed to monitor whether the CI's use of the cigarette sale proceeds was compliant with **ATF** regulations. *See* Office of the Inspector General's September, 2013 Report: *Audit of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Use of Income-Generating Undercover Operations,* available at http://www.justice.gov/oig/reports/2013/a1336.pdf.

The above circumstances, alone and in combination, are so outrageous as to violate a universal sense of justice and Mr. Gibb's right to due process of the law.

WHEREFORE, for the above reasons, undersigned counsel requests that this Court dismiss the indictment with prejudice.

                Respectfully submitted,

                /s/ Ronald E. Jenkins

                Ronald E. Jenkins     #23850MO
                150 N. Meramec Avenue, Suite 400
                St. Louis, Missouri 63105
OF COUNSEL:            (314) 721-2525
JENKINS & KLING, P.C.    (314) 721-5525 (facsimile)
                ATTORNEY FOR DEFENDANT MICKY GIBB

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2014, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Monica A. Stump, Assistant United States Attorney
William D. Stiehl, Jr., Esq.

                /s/ Ronald E. Jenkins
                _____