IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 3:13-CR-30170-DRH |
| | ) | |
| MICKY GIBB, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT MICKY GIBB'S MOTION TO DISMISS INDICTMENT (DOC. #104)

The United States of America, by Stephen R. Wigginton, United States Attorney for the Southern District of Illinois, and Monica A. Stump, Assistant United States Attorney, and request that Defendant Micky Gibb's Motion to Dismiss Indictment (Doc. #104) based on entrapment and outrageous government conduct be denied. Entrapment is an affirmative defense to be asserted only at trial, and this Circuit does not recognize the outrageous government conduct defense.

### PROCEDURAL BACKGROUND

Defendants Micky Gibb (Gibb), Christopher Jenkins (Jenkins) and Antwyne Warren (Warren) are charged with conspiring to knowingly and intentionally possess with the intent to distribute five kilograms or more of cocaine and aiding and abetting, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2 (Count One); using or carrying firearms in furtherance of a drug trafficking crime and aiding and abetting, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2 (Count Two).

Indictment (Doc. #22).[1]  Each defendant is also charged separately with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Counts Three through Five).  *Id.*  Warren is charged with possession of heroin, in violation of Title 21, United States Code, Section 844(a).  *Id.*  Trial is set for February 23, 2015.

**FACTUAL BACKGROUND**

Beginning in April 2013, ATF agents initiated a large-scale operation in the Eastern District of Missouri and the Southern District of Illinois targeting violent offenders in the St. Louis metropolitan area.  This operation, known as the Violent Crime Reduction Partnership Surge (hereinafter "the Surge"), was in response to increasingly high violent crime rates in both jurisdictions and the extraordinarily high murder rate in the city of East St. Louis, Illinois.  The Surge was compromised of components, one of which was entitled Gideon V.  This component utilized undercover agents, confidential informants, and the home invasion investigative technique.

In June 2013, agents assigned to Gideon V investigated an individual known as "Mook G," later identified as Demetrius Williams.  A confidential informant (CI) met Mook G and introduced him to an ATF undercover agent (hereinafter the UC).  A short time later, Mook G introduced Gibb to the CI in East St. Louis, IL.  Gibb immediately bragged to the CI about being a shooter and told the CI to "Google" him.  Gibb told the CI that Gibb had committed previous robberies and boasted about his criminal record.[2]  The CI informed Gibb that the CI had an associate who was looking for a crew of individuals to conduct a robbery of his drug source.  Gibb replied that he would like to meet the CI's associate to discuss the robbery.

---

[1] The Indictment arose out of a Criminal Complaint signed on July 3, 2013, accusing the three defendants of conspiring to possess with the intent to distribute cocaine and using or carrying a firearm in furtherance of a drug trafficking crime.  Complaint (Doc. #1).

[2] This introduction was not recorded due to the spontaneity of the encounter.

The CI contacted ATF agents assigned to Gideon V. The agents queried Micky Gibb's criminal history and learned that since 2006, Gibb had prior convictions for Aggravated Battery (2 prior convictions), Aggravated Unlawful Use of a Weapon (2 prior convictions), Domestic Battery, Resisting a Peace Officer, Interference with a Report on Domestic Violence, Burglary and Obstructing Justice, as well as prior arrests within the last three years for Home Invasion, Reveal Trade Secrets, Theft, Illegal Possession or Transportation of Liquor, Unlawful Possession of a Weapon by a Felon, and Attempted Unlawful Use of a Weapon. Because of Gibb's violent criminal record and statements to the CI, the agents directed the CI to arrange a meeting if Gibb agreed.

The following day, on June 27, 2013, after multiple attempts by the CI to awaken Gibb the CI drove Gibb to meet with his associate--the UC.[3] Gibb met the UC in Sauget, Illinois, in the parking lot of the Route 3 Fuel and Liquor.[4] Gibb introduced himself to the UC as "JR." The UC explained to Gibb that he transported "kilos" of cocaine for a cartel organization and wanted out of the business because he was not being paid as much as promised. The UC explained to Gibb that he transports one to three kilograms of cocaine and that because he is trusted by the cartel, he is usually one of the first individuals to pick-up cocaine from the stash house. The UC stated that in the past he has seen at least fifteen kilos inside the houses.

Gibb asked the UC if the individuals he worked for were "Mexicans," to which the UC answered yes and stated there were always two of them inside the house. The UC told Gibb that one of the Mexicans was always armed with a pistol in his waistband. The UC explained to Gibb the importance of timeliness and that once he received the call from the Mexicans, he

---

[3] In this investigation, the CI drove Gibb and others to all meets with the UC.

[4] Each meeting with the UC described in this response was recorded. All rides to and from the meeting were also recorded.

would only have thirty minutes to get to the stash house or they would move the cocaine. Gibb asked the UC, "So you want to be done fucking with them . . . no matter what it takes?" to which the UC answered yes. The UC told Gibb that he had to look like a victim in the robbery because the cartel knows some of his people.

The UC advised Gibb that the Mexicans would not just hand over the cocaine, to which Gibb replied, "I been to the joint, I know how these things get down. I already know." Gibb then indicated that he would have to get guys he knew who would not back out on him. The UC informed Gibb that if he was going to conduct the robbery, he needed individuals who had experience committing such robberies, to which Gibb replied, "Exactly." The UC further stated he needed professionals, and the UC assumed Gibb was that guy. Gibb replied, stating, "Right . . . I get down." Gibb told the UC to "work his end" to which the UC told Gibb that he would need to find his own crew. Gibb asked the UC how many days he would have to assemble the crew, to which the UC stated he would have more information regarding the date after talking to his connection, which the UC believed would be that evening. Gibb indicated he had some guys who would assist him.

Gibb told the UC, "I'm looking for the money; I don't care to see where it's at." The UC told Gibb that there was not any money inside the house, just "pure cocaine" from the cartel. Gibb replied, "to me you see, that's still money." The UC informed Gibb that the packages of cocaine had stamps on them identifying with which cartel they were affiliated and asked Gibb if he knew what to do with them. Gibb replied, "I just break it down." The UC asked Gibb what his thoughts were regarding splitting the cocaine from the robbery down the middle and Gibb stated, "Down the middle. Exactly." Because Gibb had been sleeping when the CI arrived to pick Gibb up, the UC suggested they meet at a later time. Gibb responded, "Shit man, if it

4

money man, I'm up man." The UC confirmed meeting the next day with Gibb's crew, to which Gibb replied, "I'm getting them lined up tonight." Gibb then asked the CI for a ride to "the city."

After the meeting, the CI drove Gibb to a residence in East St. Louis, Illinois, to meet with other members of the robbery crew. During the drive, Gibb asked the CI about the number of people inside the stash house and the CI indicated there were two and fifteen things, referring to kilograms of cocaine. A short time later, Gibb told the CI that he has been waiting for something like this.[5]

Once at the house, the CI stated he was greeted by three unknown individuals. Gibb informed the three individuals about the robbery. The CI observed six firearms, including two rifles and four handguns. Gibb and the others again bragged about committing robberies and having pistol whipped someone in the past.[6]

On June 28, 2013, Gibb met with the UC. Gibb brought "Jero," later identified as Jerry Pirtle, to the meeting. On the way to the meeting, Gibb told Pirtle, "Me, you, Chub, and Pac Man, we're in there." During the meeting, the UC explained the details of the robbery to Gibb and Pirtle. When asked if Gibb and Pirtle knew what their plan was for the robbery, Gibb replied that they would go inside and do what they needed to do. Pirtle, however, did not show up for any other meetings. The UC asked Gibb if he had a car; to which Gibb responded, "See that's the problem." The UC offered a car containing a trap to Gibb if he needed it. Gibb agreed to use the car.

On June 29, 2013, the UC met with Gibb and "Yellow," later identified as codefendant Christopher Jenkins, inside the UC's Hummer in the same gas station parking lot in Sauget, Illinois. The UC first told Gibb and Jenkins that the pick-up date for his cocaine would be July

---

[5] This conversation was recorded, but the device's battery died after a few hours of recording.

[6] This event was not recorded.

2, 2013, and that the house would be on the south side of St. Louis. The UC then explained the same robbery scenario to Jenkins as the UC had with Gibb. Jenkins agreed to commit the robbery. The UC also asked whether or not Gibb and Jenkins had firearms. Gibb informed the UC that they currently had two firearms. Gibb told the UC that there would be three individuals committing the robbery. The UC again offered the use of his car with a trap and asked that the crew get together early on July 2, 2013, and indicated that he only had 30 minutes to get to the stash house or the cocaine would be moved and they all would lose their opportunity. The UC said that there was no way they could be waiting on anything, to which Gibb replied, "Ain't gonna happen, ain't gonna be waiting." Gibb also expressed concern in acquiring a third gun, but added that they were going to lay everyone down.

When asked what Gibb planned to do with the UC during the robbery, Gibb responded that he would put everyone on the ground. Gibb told the UC that he and his crew were ready to do the robbery and they were "just waiting on Tuesday." Gibb indicated they were coming into the house in "full force" because of the door being locked. The UC stated he would leave the door unlocked. The UC confirmed they would meet again on July 2, 2013, and suggested that the guns be put in the trunk. The UC asked Gibb and Jenkins if they were good with everything, to which Jenkins replied, "I'm good" and Gibb said, "It ain't no problem."

Gibb, Jenkins, and the CI left the meeting in the CI's vehicle. During the drive back to East St. Louis, Gibb told Jenkins, "The other two we're going in there with, we're wacking them . . . you know what I'm saying because we can't play. . ." Gibb also commented, "We split everything fifty-fifty," and "This is our opportunity right here man . . . got this in the bag. . ." He then added, "If we gotta kick the door open they got the ups, you know what I'm saying? But if he unlock that door, Boom! Nigger, we come in, Bam! We already up, push him to the side,

knock him down, Boom! We fire their ass up. You know what I'm saying? Get our shit and come home, you know what I'm saying?" Gibb also stated, "If it's got a stamp on it. . . you know . . . knock that logo off that motherfucker and stretch that bitch, you know what I'm saying?" Gibb then stated, "You just get a hold bro, you hear me? You need to do that asap." Jenkins replied, "Yeah." Gibb told Jenkins, "We're going in this bitch as a team bro, we ain't leaving nobody nigger, you hear . . .we all got each others back." Before dropping off Jenkins, Gibb told Jenkins again, "Call bro" to which Jenkins responds, "I got it."

On July 2, 2013, Gibb came to the CI's residence in the morning. The CI left Gibb and met with ATF agents, who searched the CI and the CI's vehicle for contraband with negative results. The CI returned and met Gibb at the CI's residence. Gibb got in the CI's vehicle and the two drove to the area of Glenwood Avenue in East St. Louis and picked up Warren and Jenkins. After they got in the car, Gibb handed Warren and Jenkins nylon stocking caps. Jenkins later tells Gibb he is not "going in with that shit . . . no mask on my face." All three defendants and the CI drove to a house on Glenwood Avenue and the defendants went inside the house.

When the defendants returned to the car, the CI saw that Warren and Jenkins in had firearms. The CI and Gibb told Warren and Jenkins to put the guns in the trunk, which Gibb and Jenkins did. The CI and defendants then drove to meet the UC at the same location in Sauget, Illinois.

Once in Sauget, they got inside the UC's Hummer, and the UC repeated the same details about the stash house robbery. Warren acknowledged his understanding of the plan by stating "Alright." Jenkins then told Gibb that they should follow the UC inside the residence, to which Gibb agreed. When referring to the guards, Jenkins stated he would rather "catch both of them in the same spot." He also stated, "We gonna go up in, we ain't playing no games." Gibb then

stated, "We putting them . . . just laying them down." Jenkins next stated, "They definitely got to go to sleep." Gibb added, "And we act like we sticking them up . . . get our shit, boom. Fifty-fifty we right . . . we splitting it fifty-fifty. We get out of there." The UC looked directly at Warren and asked if he agreed to the plan, to which Warren answered, "Yeah."

As the crew exited the vehicle, Gibb asked the UC if he had a firearm for him. The UC advised that he did not. Gibb became upset with the UC and advised that he thought the UC was providing Gibb a firearm for the robbery. Gibb walked away from the UC's vehicle with the others and re-entered the front passenger seat of the CI's vehicle, which was parked adjacent to the passenger side of the UC's vehicle. The UC asked if the crew had firearms. The CI acknowledged in the affirmative, and Gibb stated "yeah," nodding his head up and down. The UC invited Gibb to abandon the robbery, saying "If you ain't feeling it." Gibb responded, "Man, fuck it. We fittin' to do this man." The UC left the parking lot, with the CI following, and drove to the warehouse where the car with the trap was located.

During the drive to St. Louis, Warren asked Gibb, "For real, there's gonna be a five, five-way split?" referring to the split of the cocaine load after the robbery. Gibb responded, "To be for real, it's a fifty-fifty, boom." Gibb added, "Once we split it fifty-fifty . . . he gonna break him off his shit . . . and we do our."

At the warehouse, Gibb, Jenkins, and Warren were arrested. Following their arrests, the agents seized a Colt, .38 caliber revolver, loaded with four rounds of ammunition, and a Taurus, 9mm handgun, loaded with nine rounds of ammunition in the trunk of the CI's vehicle where the guns had been placed earlier by Gibb and Jenkins. The agents also found a nylon stocking cap inside the CI's car. Law enforcement interviewed Gibb (and the other codefendants) following a waiver of <u>Miranda</u> rights. During the interview, Gibb admitted to having two prior convictions.

8

From June 27, 2013, through Gibb's arrest, there were multiple instances when the CI and Gibb were together. These conversations were unrecorded. Gibb repeatedly expressed excitement about the robbery to the CI. Gibb also told the CI twice that he was going into the stash house "blasting" and intended to kill the occupants.

Gibb has a reputation for being a shooter and a robber. After Gibb's arrest, law enforcement asked three witnesses independently to describe Gibb. Jason Bryant, or "Chub" stated that Gibb has a long rap sheet, is wild and crazy, hits "licks" and hustles.[7] Jerry Pirtle, who came to the second meeting on June 28, 2013, stated that Gibb is known as a shooter and someone who commits licks. Last, Jenkins indicated that Gibb had a reputation for hitting licks, shooting, and selling crack cocaine.

Finally, Gibb himself has admitted to his prior conduct. A cooperating defendant charged in a separate case and who was housed in jail with Gibb provided the Government with handwritten statements Gibb made while in custody. Exh. 1. For instance, Gibb stated that he has done stuff like this before and never been caught. "I ain't got no drug or robbery in my background 'cause they ain't never caught a nigga. So they don't know shit, this is all entrapment on a nigga." Gibb also stated, "I ain't stupid, hit licks before this, not like I ain't done before."

## ARGUMENT

Gibb argues that the Government entrapped him into committing the charged crimes. Gibb maintains he was not predisposed to commit a stash house robbery because he was a "troubled individual who lacked the propensity to independently orchestrate a stash-house robbery," and because his criminal record did not reveal any convictions for stash house

---

[7] A "lick" is slang for robbery. "Hustle" is slang for selling drugs.

robberies or similar offenses. Mot. to Dismiss (Doc. #104) at 5-6. He also argues that the inducement to commit the robbery was extraordinary, pointing to "pressure" by the UC to repeatedly commit to the robbery, be a "professional," have multiple meetings, and assemble a crew. *Id.* at 7-8. Based on the defense of outrageous government conduct, Gibb argues that the investigative technique employed resulted in the Government's manufacture of the charged offenses. *See id.* at 8-12.

### A. ENTRAPMENT

Gibb's Motion to Dismiss based on entrapment is premature. Entrapment is an affirmative defense to be asserted at trial. *United States v. Orr*, 622 F.3d 864, 868 (7th Cir. 2010). It is an issue solely for the jury's consideration. *See United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010) (internal citations omitted). Consequently, this Court simply cannot grant the relief Gibb seeks.

Gibb's motion fails, even if examined on the merits. To establish the defense of entrapment, the defendant must prove "[1] government inducement of the crime, and [2] a lack of predisposition on the part of the defendant to engage in criminal conduct." *United States v. Blassingame*, 197 F.3d 271, 279-80 (7th Cir. 1999); (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1998)). A defendant's burden is to establish more than a scintilla of evidence, although the evidence need not be so substantial that, if uncontroverted, it supports a finding of entrapment as a matter of law. *Blassingame*, 197 F.3d at 280. If a defendant adequately establishes both elements of entrapment, the burden shifts to the government, which can rebut the entrapment defense by proving beyond a reasonable doubt either the absence of government inducement *or* the defendant's predisposition to commit the offense. *Id.*

Gibb was predisposed to commit the charged offenses. "If the evidence shows the defendant's predisposition, the entrapment defense should be rejected without any inquiry into government inducement." *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010). The predisposition inquiry "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to commit the crime." *Blassingame*, 197 F.3d at 280-81 (quoting *Mathews*, 485 U.S. at 63). The facts here demonstrate that Gibb falls into the category of unwary criminal.

In determining whether a defendant was predisposed to commit a crime, the following factors are relevant: (1) the defendant's character or reputation, including prior criminal history; (2) whether law enforcement officers initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether defendant showed a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *United States v. Higham*, 98 F.3d 285, 291 (7th Cir. 1996). Here, these factors compel a finding that, as a matter of law, Gibb was predisposed to commit the charged offenses.

### 1. Gibb's Character or Reputation

In this case, the UC's principal point of contact—and the defendant who recruited the other defendants into the conspiracy—was Gibb. Having been presented with the proposed stash house robbery and also offered repeated opportunities to back out, Gibb assured the UC a number of times that he or the crew (using "we") were "just waiting on Tuesday." If these statements left any doubt, Gibb's extensive criminal history dispels any notion that he lacked a predisposition to commit the charged offenses. Among other crimes, since 2006, Gibb has been convicted of Aggravated Battery (2 convictions), Aggravated Unlawful Use of a Weapon (2

convictions), Domestic Battery, Burglary, Obstruction of Justice, Resisting a Peace Officer, and Interference with a Report on Domestic Violence. In the last three years, he has been arrested for Home Invasion, Theft, Reveal Trade Secrets, Illegal Possession or Transportation of Liquor, Unlawful Possession of a Weapon by a Felon, and Attempted Unlawful Use of a Weapon.

Bryant, Pirtle and codefendant Jenkins described Gibb's reputation: he "hits licks" and is a shooter. Indeed, Gibb bragged about committing robberies to the CI when they first met and following the first meeting, told the CI that he has been waiting for something like this. Gibb also has bragged about his criminal prowess while in custody, claiming he "ain't got no drug or robbery in my background 'cause they ain't never caught a nigga" and "I ain't stupid, hit licks before this, not like I ain't done before." These are the very same actions Gibb comfortably and excitedly discussed with Jenkins, Pirtle, the CI, and the UC. In short, Gibb's character and reputation and his own statements show Gibb was predisposed to commit the crimes charged.

**2. Gibb Actively Planned and Participated in the Charged Offenses**

Even though law enforcement presented Gibb with the opportunity to rob a stash house, Gibb actively participated in planning and preparing for the robbery. Gibb was not targeted by ATF. He voluntarily sought out the opportunity to commit a robbery so he could get "50-50." Indeed, he attempted to recruit Pirtle and successfully recruited Jenkins and Warren. Gibb provided nylon stocking caps to be used as masks during the robbery. Gibb and Jenkins extensively discussed their plans for entering into the stash house in front of the UC and the CI. Gibb repeatedly and easily spoke about going into the stash house "blazing" and "laying everybody down." Gibb told the UC the crew would have two firearms, and two loaded firearms were found in the trunk of the CI's car after Gibb's arrest where Gibb and Jenkins put them. Gibb therefore actively planned and participated in the charged offenses. The fact that the

12

Government afforded him an opportunity to commit the charged offenses is not enough to establish entrapment. *United States v. King*, 75 F.3d 1217, 1223-24 (7th Cir. 1996).

### 3. Gibb Engaged in the Criminal Activity for Profit

Gibb expected to get half of the approximate 15 kilograms of cocaine he planned to steal, which he would later divide among Jenkins and Warren and resell for profit. *See Hall*, 608 F.3d at 343-44 (rejecting entrapment defense in similar circumstances where defendant "was presented with the same temptation faced by any person contemplating the robbery of a drug stash house: the chance to acquire quickly a large amount of drugs that could be resold for a big profit," and noting that defendant's plan to split stolen drugs four ways further undercut inducement argument). He had no trouble telling the UC he was looking for money, and when referring to the cocaine said that he would "break it down" and "stretch that bitch" to resell the product. Gibb clearly engaged in the charged offenses for profit.

### 4. Gibb Did Not Show a Reluctance to Commit the Offense

Far from showing a reluctance to commit the offense, Gibb rejected repeated opportunities to back out of the scheme or voice concern. Gibb met with the UC four times and each time heard the details of the robbery. He repeatedly assured the UC that he was committed to the robbery. Each meeting presented a new opportunity to back out of the robbery. Even at the last minute, when Gibb was frustrated that the UC did not provide him with a firearm and before driving to the warehouse, the UC gave Gibb another chance to excuse himself from the robbery. The UC asked Gibb "If you ain't feeling it?," to which Gibb replied, "Man, fuck it. We fittin' to do this man." Gibb could have walked away at this moment. He did not. *See Hall*, 608 F.3d at 345 ("[A] person who was truly reluctant to commit a crime would take advantage of a ready excuse to withdraw from a criminal enterprise."). This choice to go forward is consistent

with Gibb's character and reputation as well as his statements that he commits robberies and is a professional. The UC's repeated questioning of Gibb's willingness to commit the robbery also does not amount to "pressure" as evidenced by the fact that Gibb told the UC about the trouble he was having in getting a third firearm and that he did not have a car. Certainly, if Gibb expressed these concerns, he would have felt comfortable enough to walk away or withdraw all together. But he did not. These actions and statements are the very opposite of reluctance.

### 5. The Nature of Law Enforcement's Inducement Does Not Support an Entrapment Defense

As noted, Gibb's motive here was profit. *See Hall*, 608 F.3d at 344 ("We also disagree with Hall's contention that the sizeable potential profit from the proposed robbery of cocaine was an extraordinary inducement."). Once the UC introduced the idea of a stash house robbery to Gibb, he took responsibility for recruiting his crew, planning, and executing the scheme. Simply because the UC made remarks about punctuality, questioned Gibb about readiness, and offered Gibb the car with a trap to use does negate Gibb's willingness to commit the robbery and his active participation in the planning and execution of the crime. *See United States v. Estrada*, 256 F.3d 466, 472 (7th Cir. 2001) ("[A]ll that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements: ability is presumed."); *see also United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995) (holding that Government persistence alone is insufficient to establish entrapment). Gibb's response to the remarks and questioning established his commitment, not overborne will. Thus, Gibb was not presented with the sort of "extraordinary" opportunity "that might entice an otherwise law-abiding person" to commit the crimes charged. *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). In short, Gibb cannot show he lacked a predisposition to commit the charged offenses and his motion should be denied.

## B. OUTRAGEOUS GOVERNMENT CONDUCT

Gibb's also argues that dismissal is appropriate because the stash house robbery technique employed by the Government in this case qualifies as outrageous government conduct. The law of this Circuit does not support Gibb's theory.

"[O]utrageous government conduct" is not a viable defense in the Seventh Circuit. *See United States v. Westmoreland*, 712 F.3d 1066, 1071-72 (7th Cir. 2013) (stating "*Russell* offers no real guidance to lower courts as to the type or level of conduct by the government that might, standing alone, amount to a due process violation . . . [w]ithout such guidance from the Supreme Court, our court has disallowed such a defense in this circuit."); *United States v. White*, 519 F.3d 342, 346-47 (7th Cir. 2008); *United States. v. Sherman*, 268 F.3d 539, 548-49 (7th Cir. 2001) (refusing to recognize the defense of outrageous government misconduct even though the court was outraged by the Government possessing and disseminating child pornography on the internet); *United States v. Lopeztegui*, 230 F.3d 1000, 1003 (7th Cir. 2000); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) ("[T]he doctrine does not exist in this circuit."); *United States v. Coleman*, No. 08-CR-230, 2008 U.S. Dist. LEXIS 93737, at *3-4 (E.D. Wis. Nov. 7, 2008) (unpublished) (Stadtmueller, J.) (holding that outrageous government conduct did not justify dismissing the charges). Thus, the investigative technique employed here was not "outrageous government conduct," and Gibb's motion should be denied.[8]

---

[8] To support his argument, Gibb primarily relies on dissenting opinions from this Circuit and on one district court case in the Central District of California that is currently on appeal to the Ninth Circuit Court of Appeals. *See United States v. Hudson*, 3 F. Supp. 3d 772 (C.D. Cal. 2014); Mot. to Dismiss (Doc. #104) at 11. Defendant's reliance on these cases is therefore misplaced. As indicated above, this Circuit does not recognize outrageous government conduct, nor are any of the cases Gibb cites binding on this Court. Finally, and most importantly, the Government's conduct was reasonable under the circumstances. Gibb came to the CI and began bragging about his criminal past. *See United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) ("It is not outrageous, however, to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act.") (citing *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985)). In other words, the United States did not go "trolling for targets." *Black*, 733 F.3d at 303 (internal citation omitted). Gibb presented himself. The agents queried Gibb's criminal history and located multiple violent felony convictions and arrests. Even the *Hudson* court

Further, courts in this Circuit repeatedly have upheld convictions that resulted from virtually identical stash house robbery sting operations. *See, e.g., United States v. Kindle*, 698 F.3d 401, 412 (7th Cir. 2013) *reh'g en banc*, ___ F.3d___ (decision pending); *United States v. Lewis*, 642 F.3d 773, 785 (7th Cir. 2011); *Hall*, 608 F.3d at 347; *United States v. Corson*, 579 F.3d 804, 809-11 (7th Cir. 2009) (affirming a conviction in a stash house robbery case and commenting that "the fact that the stash house, the drugs – indeed the whole plot – was fake is irrelevant").

Alternatively, the agents' conduct in this investigation was reasonable under the circumstances presented. Gibb came to the Government's CI and immediately started bragging about his past robberies and shootings. Contrary to Gibb's assertion, the Government did not target Gibb or anyone else in this investigation. Mot. to Dismiss (Doc. #104) at 13. Gibb presented himself to the CI.[9] After learning of an opportunity to rob a drug source, Gibb asked to meet the CI's associate (the UC). Only after learning of Gibb's statements and querying Gibb's criminal record, which is extensive and which demonstrates a propensity to commit robberies and violent offenses, did the agents direct the CI to contact Gibb to determine if he

---

would agree that Gibb's statements and criminal history provided a reasonable means for the Government to offer Gibb the stash house robbery opportunity. 3 F. Supp. 3d at 780-81 ("If the Government were to actually have knowledge that a particular person had engaged in similar conduct in the past—or at least had suspicion based on identifiable facts—then the Government should and does have free rein, consistent with constitutional restrictions, to go after those individuals."). *See also United States v. Sanchez*, 138 F.3d 1410, 1413-14 (11th Cir. 1998) (finding no outrageous government conduct where the individuals contacted by ATF were suspected of being involved previously in home invasions). The agents then offered Gibb the stash house robbery and over the course of eight days, Gibb repeatedly professed his ability to complete the robbery and his excitement for the opportunity. Gibb recruited two others and attempted a third. He brought nylon caps to serve as masks for the robbery. He discussed openly his plans to shoot the stash house occupants and break down the cocaine. These acts and statements demonstrate Gibb's willingness and eagerness to participate in the charged offenses and his role in engineering and directing the charged crimes. While the Government proposed the robbery, it did not provide any firearms or manpower. The UC provided no directions or advice about how to complete the robbery, although he did offer to leave the front door unlocked and said he must look like a victim. Under these circumstances, the Government's conduct is far from shocking or outrageous.

[9] These facts render the CI's sale of cigarettes irrelevant.

wanted to meet with the UC.[10]  Gibb repeatedly expressed his willingness to commit the stash house robbery to the CI and UC.  Gibb, not the Government, brought Jenkins and Warren into the conspiracy.  Gibb, not the Government, also brought nylon caps to serve as masks during the robbery.  No one from the Government suggested that Gibb or the other defendants wear masks.  The Government offered Gibb repeated opportunities to back out, including immediately prior to Gibb's arrest.  Gibb seized the opportunity, saying "We fittin' to do this."  Thus, the Government did not coerce Gibb into committing the crime by some unreasonable means.  *Westmoreland*, 712 F.3d at 1071-72.  Gibb's argument should therefore be denied.

### C. Evidentiary Hearing is not Warranted

Lastly, Gibb seeks an evidentiary hearing on his Motion to Dismiss, but, as presented above, has provided no basis on which this Court should grant one.  *See United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004) (defendant bears "the burden of establishing the necessity of a hearing"); *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) ("[e]videntiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, nonconjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion;" and "a district court [i]s obliged to hold a hearing only if the difference in facts is material, that is, only if the disputed fact makes a difference in the outcome") (internal quotations and citations omitted); *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995) (a movant can sustain his prima facie burden "only upon the presentation of 'definite, specific, detailed, and nonconjectural' facts") (quoting *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992).

---

[10] Given these facts, the argument or suggestion that this investigation was somehow racially-motivated, Mot. to Dismiss (Doc. #104) at 13, is ludicrous, wholly inaccurate, and reprehensible.

## CONCLUSION

For the reasons stated above, this Court should deny Gibb's request for an evidentiary hearing and enter an order denying his Motion to Dismiss in its entirety.

Respectfully submitted this 7th day of November, 2014.

                    STEPHEN R. WIGGINTON
                    United States Attorney

                    *s/ Monica A. Stump*
                    MONICA A. STUMP
                    Assistant United States Attorney
                    Nine Executive Drive
                    Fairview Heights, IL  62208
                    (618) 628-3700
                    Fax:  (618) 628-3730
                    Email:Monica.Stump@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 3:13-CR-30170-DRH |
| | ) | |
| MICKY GIBB, | ) | |
| | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2014, I caused to be electronically filed the

Government's

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT
MICKY GIBB'S MOTION TO DISMISS INDICTMENT (DOC. #104)**

with the Clerk of Court using the CM/ECF system which will send notification of such filing(s)

to Ronald E. Jenkins, Esq., counsel for Micky Gibb, and all other counsel of record.

Respectfully submitted,

STEPHEN R. WIGGINTON
United States Attorney

*s/ Monica A. Stump*
MONICA A. STUMP
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL 62208
(618) 628-3700
Fax: (618) 628-3730
Email: Monica.Stump@usdoj.gov