**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**                                    **No. 13-cr-30170-DRH-1**

**MICKY GIBB,**

**Defendant.**

**MEMORANDUM & ORDER**

**HERNDON, District Judge:**

## I.   Introduction

Before the Court is defendant Micky Gibb's motion to dismiss indictment
(Doc. 104). Defendant Gibb contests the validity of the indictment asserting that it
hinges on alleged entrapment. Specifically, Gibb argues that he would not have
committed the crime but for the government's intervention. The government
responded in opposition to the motion attacking it as premature and unfounded
(Doc. 113). For the following reasons, the Court denies the motion to dismiss.

## II.   Background

This summary of the facts is derived from the detailed descriptions provided
by the parties (Docs. 104, 113) and the indictment filed in this case (Doc. 22).
Micky Gibb and his co-defendants were indicted on or about July 17, 2013, on
charges arising out of a Bureau of Alcohol, Tobacco, Firearms and Explosives
("ATF") operation known as the Violent Crime Reduction Partnership Surge
(hereinafter "Surge") (Doc. 22). Gibb currently faces charges for conspiring to

possess with intent to distribute cocaine and aiding and abetting in violation of 21 U.S.C. § 846 and 18 U.S.C § 2 (Count 1);  using and carrying a firearm during and in furtherance of a drug trafficking offense and aiding and abetting in violation of 18 U.S.C § 924(c)(1)(A)(i) and 18 U.S.C § 2 (Count 2); and possessing a firearm as a felon in violation of 18 U.S.C § 922(g)(1) (Count 3) (Doc. 22).

Federal law enforcement initiated the Surge in response to the increase in violent crime rates in the St. Louis Metro Area, which encompasses the Southern District of Illinois and the Eastern District of Missouri.  The Surge utilized undercover agents, confidential informants, and a home invasion investigative method, all together part of "Gideon V." An undercover ATF agent posed as a drug courier for a Mexican cartel in search of associates to carry out a fictitious robbery of a cartel stash house. After employing a confidential informant, the undercover ATF agent (hereinafter UC) was introduced to defendant Gibb.

The confidential informant (hereinafter CI) first met Gibb through Demetrius Williams, known as "Mook G." Gibb bragged to the CI about his criminal record, specifically mentioning that he was a shooter who the CI should "Google." However, the initial introduction was not recorded. Following introductions, the CI informed Gibb of an associate in search of a team willing to rob a local stash house. Gibb requested a meeting with the associate, who in fact was the undercover ATF agent.

After reviewing Gibb's criminal record and statements to the CI, ATF agents directed the CI to arrange a meeting between Gibb and the UC. On June 27, 2013,

the UC met Gibb in Sauget, Illinois to discuss the home invasion style robbery to recover approximately 15 kilos of cocaine. After multiple attempts to wake Gibb on that day, the CI eventually drove him to meet the UC. While planning later meetups, the UC suggested a later time of day based largely on the fact that Gibb had been sleeping. However, Gibb responded, "Shit man, if it money man, I'm up man." Meetings continued as scheduled.

The UC explained the circumstances surrounding the stash house setup. He described the "Mexicans," who were part of the cartel guarding the cocaine, as not giving the drugs over easily. Gibb responded, "I been to the joint, I know how these things get down. I already know." Gibb then specified that he would need to assemble a crew of guys he knew in order to successfully complete the job.

At a June 28, 2013 meeting, the UC informed Gibb and Jerry Pirtle, also known as "Jero," that the drug house would be guarded by two men, one of which always carried a firearm. Gibb told the UC that they currently possessed two guns, but explained that there would be three individuals committing the robbery. Gibb expressed some concern about acquiring a third gun. He stated that once the men got inside the house, they planned to lay everyone down on the ground.

The UC planned to meet Gibb and his crew again on July 2, 2013 to execute the robbery. Gibb and the CI met that morning and the CI drove to pick up Gibb's co-defendants. The CI then took the men to a house on Glenwood Avenue in East St. Louis, Illinois. Upon returning to the car, the men possessed

two guns, which Gibb and one co-defendant then placed in the trunk. The CI then drove the car to Sauget, Illinois to meet the UC.

Upon reaching Sauget, the men met with the UC, who repeated details about the stash house robbery. Gibb and his co-defendants began planning their movements once at the stash house, specifically in relation to the guards. Gibb indicated that he would rather "catch both in the same spot." He elaborated further into the discussion stating, "we putting them… just laying them down." After stealing the drugs, the men planned to split the cocaine "fifty-fifty" as compensation for the carrying out the robbery.

The UC offered Gibb one final opportunity to withdraw from the robbery plan that day. Following Gibb's visible reaction to hearing that he would not be provided with a third gun, the UC asked Gibb "if you ain't feeling it?" However, Gibb responded, "Man, fuck it. We fittin' to do this man."  As a result, the UC drove to the designated arrest location with the CI following behind in his vehicle.

At the arrest location Gibb and his co-defendants were taken into custody. Following the arrests, agents seized a loaded Colt .38 caliber revolver and a loaded Taurus 9mm handgun from the trunk of CI's vehicle, which Gibb and his co-defendant placed earlier that day. Following their arrests, Gibb and his co-defendants were indicted for their role in conspiring to commit the stash house robbery to recover 15 kilos of cocaine.

### III.   Argument

Gibb generally argues entrapment and outrageous government conduct as the basis for dismissal of the three count indictment against him. Gibb summarily states that but for the government's outrageous conduct in orchestrating the stash house robbery, Gibb would never have participated in such a crime (Doc. 104). The government's response contends that entrapment may be used as an affirmative defense solely for the jury's consideration, making Gibb's motion to dismiss the indictment on the basis of entrapment premature (Doc. 113). Further, the government argues that not only do the investigative techniques employed in this case not qualify as outrageous, but "outrageous government conduct" is not a viable defense in the Seventh Circuit (Doc. 113). Each argument will be addressed as follows.

### A. Entrapment

Entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States,* 503 U.S. 540, 553–54, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). An entrapment defense comprises two related elements: (1) government inducement of the crime; and (2) defendant lacked predisposition to engage in the crime. *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012) (citing *Mathews v. United States,* 485 U.S. 58, 62–63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)).

The "most important function of the doctrine, the one that the Supreme Court has repeatedly affirmed, is to ensure that people who are not predisposed to commit a crime are not transformed into criminals by the government" in order to protect due process violations. *United States v. Pillado,* 656 F.3d 754, 765 (7th Cir .2011) 765 (citing *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932) and *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)). However, a defendant must proffer sufficient evidence to satisfy both elements of entrapment before presenting the defense at trial. *United States v. Millet,* 510 F.3d 668, 675 (7th Cir.2007). *Plowman*, 700 F.3d at 1057. Only where undisputed evidence makes it 'patently clear' as to the elements of entrapment is it appropriate for a pretrial finding of entrapment as matter of law. *United States v. Millpax, Inc.,* 313 F.2d 152, 156 (7th Cir. 1963) (citing *Sorrells*, 287 U.S. 435).

### 1. Inducement

Government solicitation of a crime does not satisfy the element of inducement required for an entrapment defense. *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014). The Seventh Circuit recently expanded upon the meaning of "government inducement" in a stash house robbery case.

> "The fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts."

*United States v. Blitch*, No. 11-3519, 2014 WL 6766697, at *6 (7th Cir. Dec. 2, 2014) (quoting *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014). The Seventh Circuit elaborated on the "solicitation plus" standard for inducement by stating:

> The "other conduct" may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts."

*Mayfield*, 771 F.3d at 435. Satisfying inducement requires much more than contact and opportunity by the government. Mere promotion of an opportunity for defendant to commit a crime, which he was ready and willing to commit, does not satisfy government inducement. Therefore, a defendant must also offer evidence that he was not predisposed to commit the crime of which he is accused.

### 2. Predisposition

Predisposition denotes the probability that a defendant would have committed the crime without the government's involvement, or had a previous intent to commit the crime, but not yet found the means to do so. *Mayfield*, 771 F.3d at 436. Many factors weigh into determining a defendant's predisposition. These include: (1) whether defendant has a prior criminal record; (2) whether criminal activity was initially suggested by the government; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant

exhibited signs of reluctance to commit the crime that was later overcome by government inducement; and (5) the type of the government inducement. *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983)

According to Gibb, the government solicited him to commit the robbery, and he was not predisposed to commit a stash house robbery prior to meeting with the CI and UC (Doc. 104, p. 6). He argues that his criminal history fails to show a proclivity for stash house robberies. He also claims that he "lacked the propensity to independently orchestrate a stash-house robbery and was susceptible to persuasion from government actors" based on his cognitive level (*Id.*) and medical history (Doc. 73).

The government argues that, even if the Court were to consider defendant's argument at this juncture, there is ample evidence to suggest that the government did not induce Gibb to commit the crimes charged, and that he was actually predisposed to commit the crimes. The government claims that once presented with the stash house robbery proposal, Gibb readily acted as willing participant with a professed ability to carry out the crime in collaboration with his codefendants. Gibb and his co-defendants were recorded planning the methodology of the robbery in the UC's vehicle on the day they believed they were committing the crime. The government also points out that Gibb has a lengthy criminal record. Upon meeting the CI, Gibb boasted about his criminal record and previous robberies, even going so far as to instruct the CI to "Google" him prior to requesting the introduction to the CI's associate (Doc. 113, p. 2).

**B. Entrapment-an affirmative defense**

The affirmative defense of entrapment should be raised at the criminal trial, rather than by a pretrial motion to dismiss, as it remains an issue of fact for the jury to consider. *United States v. Orr*, 622 F.3d 864, 868 (7th Cir. 2010); *United States v. Mayfield,* 771 F.3d 417 (7th Cir. 2014); *United States v. Blassingame*, 197 F.3d 271 (7th Cir. 1999). As a prerequisite for presenting entrapment to the jury, a defendant must display "sufficient evidence from which a reasonable jury could find entrapment." *Mayfield*, 771 F.3d at 440 (quoting *Mathews v. United States,* 485 U.S. 58,62, 108 S. Ct. 883, 886, 99 L. Ed. 2d 54 (1988)). Failure to do so may result in the court's issuance of a pretrial ruling that excludes the presentation of the defense at trial. *See Blassingame*, 197 F.3d at 279. Only if a defendant meets this threshold burden is he entitled to present the question of entrapment to the jury.

In this case, Gibb asks the Court to dismiss the indictment based on facts that run to his defense. Because entrapment is an affirmative defense asserted at trial, the government contends that Gibb's motion is premature at this stage of the proceedings; ergo the defense cannot be tested by moving to dismiss the indictment. Whether Gibb will meet his burden to establish both elements of entrapment is a mixed question of law and fact. Entrapment shall be resolved by the jury as a factual matter if Gibb satisfies his burden to establish 'more than a scintilla of evidence' in support of his defense prior to presentment to the jury.

*Mathews* 485 U.S. at 63.  It shall not be decided by the Court upon moving to dismiss the indictment in this case.

### C. Outrageous Government Conduct

'Outrageous government conduct' arises when the actions of law enforcement officers or their CIs are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). Gibb moves to dismiss the indictment alleging outrageous government conduct on the part of the UC and the government's use of the "Gideon V" operation style. Gibb claims that the UC induced Gibb, who otherwise lacked propensity to commit the robbery, to participate in the crime. Gibb asserts that he was goaded with promises of a large payout from the cocaine to be recovered during the robbery (Doc. 104).

Although Gibb argues that 'outrageous government conduct' is recognized as a defense in other circuits, the Seventh Circuit does not recognize such a defense. *United States v. Stallworth*, 656 F.3d 721 (7th Cir. 2011) (citing *United States v. White*, 519 F.3d 342, 346 (7th Cir. 2008)); *United States v. Sherman*, 268 F.3d 539, 549 (7th Cir. 2001). Additionally, the Court notes that the government's conduct in this case, even as alleged by Gibb, is not so outrageous as to satisfy the "extremely high standard" necessary to dismiss an indictment for outrageous government conduct as adopted by other circuits. *See e.g. United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013). Furthermore, the Seventh Circuit noted that it has "never taken what [it] see[s] to be an extreme step of

dismissing criminal charges against a defendant because of government misconduct." *United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006).

Finally, the Supreme Court has never held that the government's mere use of undercover agents, confidential informants, or deception strategies, gives rise to outrageous government conduct in violation of 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment. *Russell*, 411 U.S. 423, 432 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)). As a result, the Court declines to take such a step here.

### IV.    Conclusion

Accordingly, the Court **DENIES** Gibb's motion to dismiss indictment (Doc. 104) and **DENIES** Gibb's request for hearing concerning the motion dismiss indictment.

**IT IS SO ORDERED.**

Signed this 11th day of December, 2014.

Digitally signed
by David R.
Herndon
Date: 2014.12.11
16:14:52 -06'00'

**District Judge**
**United States District Court**